# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

REV. CHRISTOPHER B. CLARKSON,

Plaintiff,

vs.

IOWA DEPARTMENT OF
TRANSPORTATION, and MARK F.
WANDRO, DIRECTOR,

Defendants.

No. C03-2038-LRR

**ORDER**

_____

## *I.  INTRODUCTION*

The court held a bench trial in the above-captioned case on Tuesday, April 19, 2005.  Plaintiff Reverend Christopher B. Clarkson appeared pro se and Defendants were represented by Mark Hunacek, Assistant Attorney General for the State of Iowa.  Fran Rout appeared as a representative of the Iowa Department of Transportation ("IDOT").  The case is fully submitted and ready for decision.

## *II.  PROCEDURAL BACKGROUND*

Clarkson filed this action on July 28, 2003 alleging Defendants IDOT and its Director, Mark F. Wandro ("Wandro"), discriminated against him on the basis of his disability when they refused to issue to Clarkson a five-year unrestricted driver's license, but rather issued to him a two-year "W" restriction driver's license despite his physician's certification his medical condition, multiple sclerosis ("MS"), did not affect his ability to drive.  Clarkson alleges the actions of the IDOT and Wandro violated Title II of the Americans with Disabilities Act, (the "ADA"), 42 U.S.C. § 12132; the federal regulations implementing the ADA; section 504(a) of the Rehabilitation Act of 1973, 29 U.S.C. §

794(a); and the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. Clarkson seeks in his Complaint wide-ranging relief including: (1) injunctive relief in the form of the court's instruction to the IDOT to restore Clarkson's driver's license record to that of an unrestricted driver's licensee, to remove the note which refers to Clarkson's intent to make a complaint to the Civil Rights Commission regarding the IDOT's actions, to prohibit any retaliatory actions by the IDOT and to issue to Clarkson an unrestricted five-year driver's license; (2) an award of compensatory damages for harm Clarkson allegedly has suffered as a result of the IDOT's actions, including emotional distress damages; and (3) a ruling the IDOT must make appropriate changes in the way it implements the procedures outlined in the Iowa Code so the IDOT ensures safety but not at the expense of qualified drivers with disabilities who meet the essential eligibility requirements to drive as set out in "anti-discrimination law."[1]

On July 28, 2003, the IDOT and Wandro filed a motion to dismiss Clarkson's Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants argued Clarkson's claims were not ripe for review; the IDOT, a state agency, is entitled to Eleventh Amendment immunity on Clarkson's ADA claims; and Defendants did not discriminate against Clarkson on the basis of his disability as a matter of law. By Order dated March 15, 2004, the court: (1) denied

---

[1] In his Complaint, Clarkson also sought relief in the form of a ruling that the Iowa legislature's delegation to the IDOT of the "broad powers" granted to the IDOT by Iowa statute is an unconstitutional delegation of power and that the Iowa legislature must limit the "broad powers" granted to the IDOT to prohibit the IDOT from violating anti-discrimination law. Clarkson has not addressed these claims in any of the briefs he has filed in this action, nor did he present any evidence or argument on these claims at trial. The court therefore finds Clarkson has abandoned these claims. Nevertheless, the court's review of the statutes at issue leads the court to conclude Clarkson's arguments in this regard are without merit.

Defendants' motion to dismiss on ripeness grounds; (2) granted Defendants' motion to dismiss Clarkson's ADA claims against the IDOT based upon the State's Eleventh Amendment immunity from suit and dismissed those claims with prejudice; (3) granted Defendants' motion to dismiss Clarkson's ADA and Rehabilitation Act claims for money damages against Wandro in his individual capacity; (4) denied Defendants' motion to dismiss Clarkson's claims against Wandro in his official capacity for prospective injunctive relief under the ADA and the Rehabilitation Act; and (5) granted Defendants' motion to dismiss Clarkson's claims against the IDOT and Wandro under the Civil Rights Act of 1964 and dismissed those claims with prejudice. Thus, the court's ruling on Defendants' Motion to Dismiss left the following claims remaining: (1) Clarkson's claim against the IDOT for violation of section 504(a) of the Rehabilitation Act; and (2) Clarkson's claims for prospective injunctive relief under the ADA and the Rehabilitation Act against Wandro in his official capacity.

On April 14, 2004, Clarkson filed a motion for summary judgment in which he alleged, based upon the Defendants' admissions in their Answer to Clarkson's Complaint, that there are no genuine issues of material fact on any of his claims and therefore he is entitled to summary judgment. On April 28, 2004, Defendants resisted Clarkson's motion for summary judgment and filed a cross-motion for summary judgment. Defendants alleged in their cross-motion for summary judgment Clarkson's claims for injunctive relief were rendered moot by changes the IDOT has since made to its policies and Clarkson's claims for damages were rendered moot because Clarkson never felt the effect of the "W" restriction because the IDOT removed the "W" restriction and allowed Clarkson to obtain an unrestricted five-year driver's license. The court denied both parties' motions for summary judgment and allowed the case to proceed to trial.

## III. FINDINGS OF FACT

The court finds the following facts after accepting the stipulations of the parties, the undisputed material facts submitted in connection with the parties' respective motions for summary judgment, and the relevant evidence presented by the parties at trial.

Clarkson has MS and was diagnosed with the disease in 1994. On August 7, 2002, Clarkson went to the Floyd County Driver's License Station at the Floyd County Treasurer's Office in Charles City, Iowa, to obtain a driver's license. Clarkson's then-current driver's license had expired, and he had forgotten to renew it. Clarkson arrived at the driver's license station using an electric scooter. He stood for several minutes while he took the eye exam. He stated to the driver's license examiner (the "examiner") that he used a cane at home and that he had no assistive devices for driving because he did not need them. When the examiner asked Clarkson why he was using an electric scooter, he answered "to conserve my energy on long distances." When the examiner asked Clarkson what condition Clarkson had, Clarkson responded, "In the past, when seeking a license renewal, I have been asked 'Do you have any mental or physical disabilities that would affect your driving?' to which I have answered 'no' because that was and is the case." The examiner asked Clarkson again what his condition was, and Clarkson responded, "What do you mean 'my condition?' Are you asking whether my symptoms affect my driving? The answer is no. I have never had an instance where I have been unable to drive safely." Clarkson also told the examiner he had "worked for the Civil Rights Commission in college and was surprised by the question about what [his] 'condition' was if this was an attempt to find out personal medical information which had no bearing on [his] driving ability." Clarkson further stated to the examiner that he considered the examiner's question regarding his personal medical information unnecessary and that the examiner's question seemed to indicate a bias toward presuming a person who used an electric

4

mobility device was unqualified to obtain a driver's license or at least suspect in his or her qualifications.  When the examiner again asked Clarkson what condition caused Clarkson to use the electric scooter, he told her he has MS.  He also informed the examiner his answer to the examiner's question was "under duress" and that he would file a complaint with the Civil Rights Commission[2] and possibly the United States Department of Justice.

Because Clarkson informed the examiner he had MS, he was not allowed to obtain a driver's license on that day.  Rather, the examiner told Clarkson he would need to submit a medical report in order to obtain his driver's license.  The medical report, the IDOT form Clarkson's physician was required to complete, asks the physician to determine whether the applicant is mentally and physically qualified to operate a motor vehicle safely.  Clarkson's physician answered both of these questions by checking the "Yes" box.  The form also contains the question, "Should the applicant be reevaluated at a driver['s] license station before the 2 or 4 year renewal cycle?"  Clarkson's physician answered this question by checking the "No" box.  On August 12, 2002, Clarkson returned to the driver's license station in Charles City, Iowa and took the completed medical report with him.  Clarkson was given a two-year "W" restriction driver's license on that date, which meant that Clarkson would be required to submit another medical report when he sought to renew the driver's license. The record does not make clear the reason for which Clarkson received a "W" restriction driver's license or what the examiner told Clarkson when the examiner gave Clarkson the restricted driver's license.

In telephone conversations on March 29 and 30, 2004, Defendants' counsel, Mr. Hunacek ("Hunacek"), spoke to Clarkson about either submitting a new medical report or taking a driving test to obtain a driver's license without the "W" restriction.  Hunacek

---

[2] The record does not indicate whether Clarkson was referring to the state or the federal civil rights commission.

informed Clarkson the IDOT could not retroactively convert the driver's license issued to Clarkson in 2002 into a five-year driver's license with no restrictions because IDOT policy did not allow for such a conversion. Hunacek indicated to Clarkson the IDOT was in the process of revising its policies and the policies had not been finalized. Hunacek further informed Clarkson "that removal of the 'W restriction' from [his driver's] license in favor of a driving test" was not conditioned upon dismissal of the lawsuit and that Clarkson had been "instrumental in changing a general policy regarding licensure and medical reporting."

On April 10, 2004, Clarkson took and passed a driving test. The IDOT allowed Clarkson to take the test at a time that was convenient for Clarkson and also allowed Clarkson to choose the individual who would administer Clarkson's driving test. Prior to April 10, 2004, Clarkson's driving record, as well as his driver's license, indicated a "W" restriction was in place. On April 10, 2004, Clarkson's driving record no longer indicated there was a "W" restriction in place. After Clarkson completed the driving test, the IDOT issued to Clarkson a driver's license without a "W" restriction. This driver's license expired on April 30, 2004.

Effective April 16, 2004, the IDOT changed its driver's license policy with regard to these issues. The IDOT no longer will make licensing decisions for applicants based on the fact that an applicant states he or she has a particular disease. Under the terms of the new policy, the IDOT will ask all applicants whether they have a mental or physical disability which would affect the applicant's ability to operate a motor vehicle safely. Depending upon the applicant's answer and upon whether the applicant has an observable physical or mental impairment, the applicant may be asked to submit a medical report or to perform a driving test. If the applicant states he or she has MS, but also states that his or her MS does not affect the applicant's ability to drive safely and if the applicant does

not exhibit any physical or mental impairments, the applicant will not be asked to submit a medical report. The IDOT will issue to the applicant an unrestricted driver's license. An applicant who uses an electric scooter will be viewed under the policy as exhibiting some physical impairment which warrants further inquiry. The IDOT's written policy includes examples of the ways in which the new policy is to be implemented with regard to the necessity for a medical report or a driving test. One example involves an applicant who states that he or she has MS, but who also states that the MS does not affect his or her driving ability and who does not demonstrate any physical or mental impairment. The example states the examiner should not ask this applicant to submit a medical report and the examiner should issue to the applicant an unrestricted driver's license. Another example involves an applicant who has an obvious impairment and states the impairment does affect the applicant's driving. Under these circumstances, the policy states "[m]edical report required. . . [d]rive test because there is an obvious impairment." The example dictates the applicant is to be required to submit a medical report or to perform a driving test because of the obvious impairment. Finally, another example involves a person who is a first-time applicant who states his or her physical impairment does not affect his or her driving. The example states it is appropriate to ask the applicant to submit a medical report prior to issuing the applicant a driver's license.

On April 30, 2004, when Clarkson appeared at the driver's license station to renew his driver's license, he arrived on his electric scooter. The results of Clarkson's April 10, 2004 driving test automatically were applied to his driver's license application and Clarkson was issued an unrestricted five-year driver's license which will not expire until 2009.

Shirley Andre ("Andre"), Director of the Motor Vehicle Division of the IDOT, testified at trial she is responsible for knowing and implementing the procedures for issuing

driver's licenses in the State of Iowa. Andre testified in 2002, when Clarkson applied to renew his driver's license, IDOT policy allowed for examiners to ask additional questions of an applicant who exhibited visual signs of a potential physical or mental impairment that might affect the applicant's ability to operate a motor vehicle safely. She stated the IDOT is aware that state and federal law dictate that the IDOT must take steps to protect the privacy and private information of driver's license applicants. Andre testified while the IDOT initially issued to Clarkson a "W" restriction driver's license in 2002, the IDOT later determined the "W" restriction was not necessary and took steps to remove the restriction. Andre testified it was her understanding the IDOT requested that Clarkson perform the driving test in 2004 because the IDOT wanted to ensure Clarkson could operate a motor vehicle safely. Andre was not personally present when Clarkson applied to renew his driver's license in 2002 or when he applied for his five-year unrestricted driver's license in 2004.

Terry Dillinger ("Dillinger"), the Director of Driver Services for the IDOT, testified at trial he is responsible for knowing and implementing the procedures for issuing driver's licenses in the State of Iowa. Dillinger testified it is permissible under IDOT policy for a driver's license examiner to ask questions of an individual applying for a driver's license to determine whether or not the individual is capable of operating a motor vehicle safely. Dillinger testified the primary mission of the Driver Services division of the IDOT is to ensure all licensed drivers can operate a motor vehicle safely. Dillinger testified if an individual who was applying for a driver's license was uncomfortable answering personal medical questions at the customer service desk of a driver's license station, the individual could ask that he or she be able to discuss those issues in a more private place and the driver's license examiner would accommodate that request. Dillinger testified it is not possible for the IDOT to administer the licensing program in a way that

does not involve singling out certain applicants for additional medical questions. Dillinger stated this is because there are medical conditions that might affect the individual's driving ability and the IDOT needs to ensure the individual can operate a motor vehicle safely before giving such individual a driver's license. Dillinger further stated in 2002, if a physician indicated on a medical report that a license applicant might have a medical condition that would affect the applicant's ability to safely operate a motor vehicle, the driver's license examiner could require that such applicant perform a driving test to demonstrate his or her driving ability. Dillinger stated he made the decision to remove the "W" restriction from Clarkson's driver's license because the IDOT believed at that point there were other ways to evaluate the issue of whether Clarkson could or could not operate a motor vehicle safely. Dillinger testified he removed the restriction upon the advice of counsel because the IDOT initially had placed the restriction on Clarkson's driver's license because he suffered from MS. Dillinger further stated the IDOT required that Clarkson perform a driving test in 2004 prior to obtaining a five-year unrestricted driver's license because the IDOT wanted to ensure Clarkson could operate a motor vehicle safely, given that Clarkson obviously used an electric scooter for mobility purposes. Dillinger also testified about the change in IDOT policy occasioned by this lawsuit, and stated the intent of the policy is to ensure licensing decisions are based upon an individual assessment of a particular applicant and not based upon stereotypes of a particular disability or medical condition. Dillinger stated that when Congress enacted the ADA, the IDOT worked with Senator Harkin's office to ensure that the IDOT complied with the ADA.

Although the IDOT hired an outside firm called Wertzberger and Associates to review its buildings for compliance with the ADA, the IDOT has not hired an outside firm to review its policies. However, the IDOT has determined its policies comply with the

terms of the ADA. Fran Rout ("Rout") is the IDOT's ADA compliance officer. The parties did not make a record on Rout's background or knowledge regarding the laws governing discrimination based upon disability or compliance with such laws. Rout testified the IDOT has in place grievance procedures for both internal and external complaints or allegations of discrimination based upon disability. Internal complaints concerning possible disability discrimination go directly to Rout. External complaints may come in through a different agency or individual, but eventually they are given to Rout for investigation and resolution. The IDOT recognizes the fact that an individual has MS or uses a wheelchair or electric scooter does not automatically mean that the individual cannot operate a motor vehicle safely.

Susan Clarkson ("Susan"), Clarkson's wife, testified Clarkson was very upset on April 7, 2002 when he returned from the driver's license station. Susan testified Clarkson was frustrated, disappointed and angry at what had taken place when Clarkson went to renew his driver's license on that day. Susan further testified Clarkson was humiliated by having to answer questions relating to his medical condition. Susan testified she had numerous conversations with Clarkson about his feelings, and Clarkson was very pained by what had occurred. Susan stated Clarkson was unable to sleep, was very restless, had difficulty eating and did not act like himself for more than fifty days after the incident. She stated Clarkson was physically sick over the events and that they really took their toll on Clarkson. Susan also testified that when Clarkson renewed his driver's license on April 30, 2004, he was disheartened and frustrated because he had to perform a driving test to renew his driver's license and he felt singled out again. Susan testified Clarkson never sought professional medical or psychological help, but rather relied upon friends and pastors to discuss his problems.

Clarkson offered into evidence at trial an affidavit signed by his son, Benjamin, in

which Benjamin stated when the examiner asked Clarkson questions regarding Clarkson's use of the electric scooter, Clarkson "seemed more than moderately uncomfortable," given the fact his father is "someone who does not discuss such personal information in the company of strangers." Plaintiff's Exhibit ("Pl. Ex.") 7 at p.1. Benjamin further stated:

> Again, I attest to the fact that my father was extremely upset with the manner in which he had been treated. His level of frustration, hurt and anguish was more than mild, more than moderate, but not quite severe.
>
> Over the ensuing days, weeks, months and years this frustration, hurt and anguish has not subsided. This is evidenced to me by the numerous (to[o] many to count) conversations my father has had with me on this subject and the fact that, in the absence of resolution the pain remains.

Pl. Ex. 7 at p. 2.

Clarkson testified he felt humiliated by the examiner's insistence on asking Clarkson questions about his physical and medical condition in a public manner at the driver's license station. Clarkson further testified his feelings of embarrassment and humiliation were compounded by the fact Benjamin was with him when these events occurred. Clarkson testified he was emotionally distressed over his failure to obtain an unrestricted driver's license and he could hardly believe it was happening. He stated he could not take his mind off the distressing experience and thought about it constantly; physically he felt sick to his stomach at times and short of breath - he even remembered vomiting at times. Clarkson testified emotionally he was worried, he ached, he hurt and when he spoke of the incident he would shake. Clarkson did not testify regarding the amount of time during which he experienced these symptoms or the amount of money he believed was necessary to compensate him for the emotional distress he allegedly suffered. Further, Clarkson offered no evidence regarding expenses he incurred or other monetary damages he suffered

as a result of the IDOT's actions.

## IV. CONCLUSIONS OF LAW

### A. Clarkson's Claim Against the IDOT

#### 1. Prima Facie Case Under the Rehabilitation Act

Clarkson contends Defendants discriminated against him on the basis of his disability when they issued to him a two-year "W" restriction driver's license rather than a five-year unrestricted driver's license, despite the fact Clarkson's medical report showed he was entitled to a five-year unrestricted driver's license. The court previously dismissed Clarkson's claim against the IDOT under Title II of the ADA and ruled only Clarkson's claim under the Rehabilitation Act against the IDOT survived. The Rehabilitation Act prohibits discrimination on the basis of disability in federally funded programs. To establish a prima facie case of disability discrimination under section 504 of the Rehabilitation Act, the plaintiff must prove:

> (1) he is a qualified individual with a disability; (2) he was denied the benefits of a program or activity of a public entity receiving federal funds; and (3) he was discriminated against on the basis of his disability.

*M.P. v. Ind. Sch. Dist. No. 721*, 326 F.3d 975, 981-82 (8th Cir. 2003).

#### 2. The IDOT's Grant of the "W" Restriction Driver's License

As an initial matter, the court notes that, while Clarkson alleges the IDOT's actions in this case violated the Rehabilitation Act, at no point during the course of the case has Clarkson offered any proof the motor vehicle division of the IDOT receives federal funding and therefore is subject to the requirements of the Rehabilitation Act. Thus, the court finds Clarkson has failed to satisfy his burden to prove the federal funding element of his prima facie case of discrimination by the IDOT under the Rehabilitation Act.

Even if Clarkson had produced at trial evidence that the motor vehicle division of

the IDOT receives federal funds, however, the court finds Clarkson's claim the IDOT's grant of the "W" restriction driver's license violated the Rehabilitation Act must fail. In order to establish a prima facie case of discrimination under the Rehabilitation Act, Clarkson was required to show he was denied the benefits of a program or activity of the IDOT and that the IDOT discriminated against him because of his MS. The evidence at trial showed, and neither party disputes, a "W" restriction was placed on Clarkson's driver's license when he obtained his driver's license in 2002. However, after the court ruled on the IDOT's Motion to Dismiss Clarkson's claims, the record makes clear that the IDOT removed the "W" restriction on Clarkson's driver's license before Clarkson's two-year driver's license expired. The IDOT granted to Clarkson an unrestricted five-year driver's license before Clarkson ever felt the effect of having been issued the two-year "W" restriction driver's license. The court therefore concludes Clarkson has failed to satisfy the second element of his prima facie case under the Rehabilitation Act, i.e. that he was denied the benefits of a program or activity of the IDOT.

The court also notes the IDOT has changed its policies regarding issuance of a driver's license to people who exhibit symptoms of impairment or who indicate they suffer from a disease which might affect their ability to drive. The new policy took effect on April 16, 2004 and requires that IDOT licensing personnel make licensing decisions based upon an individual assessment of the person seeking the driver's license, rather than on the mere fact the person states he or she has a certain disease. The IDOT also is revising the form that, when necessary, the IDOT will require individuals seeking driver's licenses to submit to a physician to obtain medical clearance regarding the individual's ability to drive without impairment and whether the individual should be issued a two-year or a five-year driver's license.

Thus, even if Clarkson had offered evidence sufficient to establish discrimination

under the Rehabilitation Act, the court's review of the record leads it to conclude Clarkson received the entirety of the relief he requested and for which he is eligible, given his claims in this case. Clarkson now has his five-year unrestricted driver's license, and the IDOT has changed its policies regarding the circumstances under which the IDOT will require a medical report and the situations in which the IDOT will impose a two-year restricted driver's license due to certain medical circumstances.

Moreover, Clarkson failed to show he suffered any legally cognizable damages as a result of the IDOT's actions in this case. At trial, Clarkson offered no evidence he suffered compensable money damages as a result of the IDOT's grant to him of the two-year "W" restriction driver's license. Clarkson's only evidence regarding damages was his own testimony and the testimony of his son and his wife that he suffered mental anguish, humiliation, anger and other emotional distress-type damages. Clarkson cites no authority for the proposition emotional distress damages are available under the Rehabilitation Act. The court's research revealed the Eighth Circuit Court of Appeals has held that "money damages" are available for a claim of discrimination under section 504 of the Rehabilitation Act. *See Rodgers v. Magnet Cove Pub. Sch.*, 34 F.3d 642, 645 (8th Cir. 1994); *Meiner v. State of Mo.*, 673 F.2d 969, 979 (8th Cir. 1982). The Eighth Circuit Court of Appeals has not addressed the issue of whether "money damages" includes emotional distress damages. However, even if the term "money damages" is to be construed to include damages for emotional distress, the court concludes Clarkson failed to produce evidence sufficient to convince the court Clarkson is entitled to recover emotional distress damages in this case. The court's review of the evidence Clarkson submitted to support his claim for emotional distress damages shows that much of the anguish, humiliation, embarrassment, anger and frustration Clarkson experienced was a result of Clarkson's having to answer questions about his medical condition at the driver's

license station. The court held in its ruling on Defendants' motion to dismiss that the examiner's questions regarding Clarkson's condition did not violate the Rehabilitation Act. Thus, Clarkson cannot recover for the emotional distress he allegedly suffered as a result of the IDOT's lawful actions. The court also notes although Clarkson alleges he suffered physical harm as a result of the mental anguish he suffered, Clarkson never sought medical assistance or professional counseling. The court therefore finds, even if Clarkson had established that the IDOT discriminated against him in violation of the Rehabilitation Act, the record in this case is insufficient to support a claim for emotional distress damages, assuming such an award is available under the Rehabilitation Act.

### 3. The IDOT's Imposition of the 2004 Driving Test

In addition to Clarkson's claim the IDOT's grant to him of a two-year restricted driver's license in 2002 violated the Rehabilitation Act, Clarkson spent much time at trial exploring the issue of the driving test he was forced to complete in 2004 prior to obtaining his five-year unrestricted driver's license. Clarkson makes no allegations regarding the 2004 driving test in his Complaint - the facts alleged in his Complaint involve only the IDOT's grant to him of the restricted driver's license in 2002. However, even if the court were to allow Clarkson to amend his Complaint to conform to the evidence adduced at trial, *see* Fed. R. Civ. P. 15(b), the court concludes the IDOT's imposition of the driving test in 2004 did not violate the Rehabilitation Act.

The Eighth Circuit Court of Appeals has ruled "[t]he rights, procedures, and enforcement remedies under Title II [of the ADA] are the same as under section 504 [of the Rehabilitation Act]." *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998) (citing *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 930 (8th Cir. 1994)). Thus, because the court was unable to find precedential authority regarding the administration of driver's license programs under the Rehabilitation Act, the court looks to the law

governing the ADA for guidance with respect to Clarkson's claims.

The parties do not dispute whether Clarkson is an "individual with a disability" under the ADA or the Rehabilitation Act. Federal regulations underlying the ADA provide that public entities may not "administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(6). Thus, in the context of licensing or certification, a person is a "qualified individual" and therefore entitled to protection under the ADA and the Rehabilitation Act if he or she meets the "essential eligibility requirements" for receiving the driver's license or certification. *Theriault v. Flynn*, 162 F.3d 46, 48 (1st Cir. 1998) (citing 42 U.S.C. § 12131(2); 28 C.F.R. pt. 35, App. A, at 472 (1997); *Applicants v. Tex. State Bd. of Law Examiners*, 1994 WL 923404, at *6 (W.D. Tex. Oct. 11, 1994)). The federal regulations contemplate conditions under which programs or activities sponsored by a public entity will involve safety questions which, in turn, affect the eligibility requirements of such programs or activities. The relevant regulation states:

> [f]or other activities, identification of the "essential eligibility requirements" may be more complex. Where questions of safety are involved, the principles established in [28 C.F.R.] § 36.208 of the Department's regulation implementing title III of the ADA, . . . will be applicable. That section implements section 302(b)(3) of the Act, which provides that a public accommodation is not required to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of the public accommodation, if that individual poses a direct threat to the health or safety of others.
> A "direct threat" is a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services. . . . Although persons with disabilities are generally entitled to the protection of this part, a person who

poses a significant risk to others will not be "qualified," if reasonable modifications to the public entity's policies, practices or procedures will not eliminate that risk.

The determination that a person poses a direct threat to the health or safety of others may not be based on generalizations or stereotypes about the effects of a particular disability. It must be based on an individualized assessment, based on reasonable judgment that relies on current medical evidence or on the best available objective evidence, to determine: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices or procedures will mitigate the risk. . . .

28 C.F.R. pt. 35, App. A at 481-82 (1999); *see also* Department of Justice, Americans with Disabilities Act Title II Technical Assistance Manual, II-2.8000 (1993). The Title II Technical Assistance Manual published by the Department of Justice presents the issuance of driver's licenses as an activity that clearly involves the issue of public safety. It provides, in pertinent part:

The phrase "essential eligibility requirements" is particularly important in the context of State licensing requirements. While many programs and activities of public entities do not have significant qualification requirements, licensing programs often do require applicants to demonstrate specific skills, knowledge and abilities. Public entities may not discriminate against qualified individuals with disabilities who apply for licenses, but may consider factors related to the disability in determining whether the individual is qualified.

ILLUSTRATION: An individual is not "qualified" for a driver's license unless he or she can operate a motor vehicle safely. A public entity may establish requirements, such as vision requirements, that would exclude some individuals with disabilities, if those requirements are essential for the safe operation of a motor vehicle.

BUT: The public entity may only adopt "essential"

requirements for safe operation of a motor vehicle.  Denying a license to all individuals who have missing limbs, for example, would be discriminatory if an individual who could operate a motor vehicle safely without use of the missing limb were denied a license.  A public entity, however, could impose appropriate restrictions as a condition to obtaining a license, such as requiring an individual who is unable to use foot controls to use hand controls when operating a vehicle.

A public entity does not have to lower or eliminate licensing standards that are essential to the licensed activity to accommodate an individual with a disability.  Whether a specific requirement is "essential" will depend on the facts of the particular case. . . .

Department of Justice, The Americans with Disabilities Act Title II Technical Assistance Manual, II-3.7200 (1993).  Thus, when making the determination of whether an individual with a disability meets the "essential eligibility requirements" for a given program or activity, a public entity may properly consider whether an applicant with a disability poses a direct threat to the health and safety of others.  *Theriault*, 162 F.3d at 48 (citing 28 C.F.R. pt. 35, App. A, at 472-73 (1997); 28 C.F.R. § 36.208(c); *Bragdon v. Abbott*, 524 U.S. 624, 626 (1998) (involving Title III of the ADA and noting the need to balance the interests of individuals with disabilities against legitimate concerns for public safety); *Sch. Bd. of Nassau County v. Arline*, 480 U.S. 273, 287 (1987) (involving Rehabilitation Act) (relied on in *Bragdon*)).  The federal regulations make clear, however, that the judgment of whether an individual with a disability poses a direct threat to the health or safety of others must be based on "an individualized assessment, based on reasonable judgment that relies on current medical evidence or on the best available objective evidence."  *Id.* (quoting 28 C.F.R. § 36.208(c); citing *Arline*, 480 U.S. at 287).

The provisions of the Iowa Code governing the issuance of driver's licenses give to the IDOT authority to take steps to ensure an applicant for a driver's license is

physically and mentally capable of operating a motor vehicle. The Iowa Code provision governing the examination of applicants for a new driver's license provides, in pertinent part:

> The department may examine every new applicant for a driver's license or any person holding a valid driver's license when the department has reason to believe that the person may be physically or mentally incompetent to operate a motor vehicle, or whose driving record appears to the department to justify the examination. . . .
>
>     *       *       *       *       *       *       *
>
> The examination shall include a screening of the applicant's eyesight, a test of the applicant's ability to read and understand highway signs regulating, warning and directing traffic, a test of the applicant's knowledge of the traffic laws of this state, an actual demonstration of ability to exercise ordinary and reasonable control in the operation of a motor vehicle and other physical and mental examinations as the department finds necessary to determine the applicant's fitness to operate a motor vehicle safely upon the highways.

Iowa Code § 321.186. The Iowa Code provision governing the renewal of a driver's license after expiration provides, in part:

> Except as otherwise provided, a driver's license, other than an instruction permit, chauffeur's instruction permit or commercial driver's instruction permit issued under section 321.180, expires five years from the licensee's birthday anniversary occurring in the year of issuance if the licensee is between the ages of seventeen years eleven months and seventy years on the date of issuance of the license. . . . A licensee whose license is restricted due to vision or other physical deficiencies may be required to renew the license every two years. . . .

Iowa Code § 321.196.[3] Thus, Iowa law imposes as an eligibility requirement for obtaining a driver's license in the first instance that an individual be mentally and physically fit to operate a motor vehicle and allows the IDOT to conduct the tests it believes are necessary to ensure the individual is able to operate a motor vehicle safely. Where the IDOT has issued a restricted driver's license due to a demonstrated visual or physical deficiency which may affect an individual's ability to operate a motor vehicle safely, the IDOT may require more frequent renewal to ensure continued fitness to operate a motor vehicle.

Clarkson does not dispute the state's authority to impose the requirement that an individual demonstrate his ability to operate a motor vehicle safely as a condition for obtaining or renewing a driver's license. Clarkson also does not dispute the proposition that the state has an obligation to inquire into an individual's fitness to operate a motor vehicle to ensure public safety. The court finds the IDOT was justified in asking that Clarkson perform a driving test to ensure Clarkson could operate a motor vehicle safely, given the fact Clarkson had informed Hunacek he would appear on an electric scooter to obtain a driver's license.[4] Under these circumstances, the IDOT was both obligated to and allowed to insist that Clarkson perform a driving test prior to granting to him a five-year unrestricted driver's license. The IDOT has a duty to ensure that each individual to whom it issues a driver's license can operate a motor vehicle safely. The use of an electric scooter indicates an individual may have a limited ability to use his or her legs, which may

---

[3] In 2002, when Clarkson sought to renew his license, an unrestricted driver's license had a four-year term. Unrestricted licenses are now issued for a five-year term pursuant to Iowa statute.

[4] The court notes the IDOT went to special efforts to accommodate Clarkson's request that he perform the driving test prior to the time at which he appeared at the driver's license station to renew his driver's license and made sure that Dale Mills, the individual Clarkson requested, administered his driving test.

or may not have a direct impact on that individual's ability to operate a motor vehicle. The IDOT therefore is allowed to satisfy itself that such individual can in fact operate a motor vehicle safely before granting to that person an unrestricted driver's license. Accordingly, the court concludes based upon the evidence admitted at trial that the IDOT did not violate the Rehabilitation Act when it required that Clarkson perform a driving test in 2004.

### B. Clarkson's Claims for Prospective Injunctive Relief against Wandro

The court further finds it unnecessary to grant to Clarkson prospective injunctive relief against Wandro in his official capacity under either the ADA or the Rehabilitation Act. As the court previously stated, Clarkson has received from the IDOT the prospective injunctive relief he requested in his Complaint - the IDOT has given to Clarkson an unrestricted five-year driver's license and the IDOT has changed its policies to ensure that what happened in this case does not happen again in the future. The court further concludes the IDOT's requirement that Clarkson complete a driving test prior to granting to Clarkson an unrestricted five-year driver's license in 2004 did not violate the Rehabilitation Act or the ADA and therefore there is no need to enjoin the IDOT or Wandro from imposing such a requirement in the future.

### V. CONCLUSION

In light of the foregoing, IT IS ORDERED:

1. The court finds in favor of Defendant Iowa Department of Transportation on Clarkson's claim of discrimination under the Rehabilitation Act of 1973. Accordingly, the Clerk of Court shall enter judgment in favor of the Iowa Department of Transportation and Clarkson's claim shall be dismissed with prejudice.

2. The court finds in favor of Defendant Mark F. Wandro, Director of the Iowa Department of Transportation, on Clarkson's claims for prospective injunctive relief under the Title II of the Americans with Disabilities Act and the Rehabilitation Act of 1973.

Accordingly, the Clerk of Court shall enter judgment in favor of Mr. Wandro and Clarkson's claims against him shall be dismissed with prejudice.

    3.  All court costs shall be assessed against Clarkson.


**SO ORDERED**.

**DATED** this 16th day of June, 2005.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA